# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____ )
United States of America The State of   )
New York and The City of New York,   )   15 CV 04506 (CS)
ex rel. Vicki Luongo,   )
  )
  )
      Plaintiffs/Relator,   )
  )
     v.   )   **SECOND AMENDED COMPLAINT**
  )   For damages and other relief
Steven Dwek, Individually; New   )
Windsor Community Fitness Center,   )
Corp.; Healthy Kids Extended Day   )   Under the False Claims Act and
Program, Inc.; and Harriman   )   New York False Claims Act
Summer Camp, S-11, Inc.,   )
  )   **DEMAND FOR JURY TRIAL**
      Defendants.   )
_____ )

    1.    This is a civil action brought by relator Vicki Luongo ("Luongo" or

"Relator") under *qui tam* and anti-retaliation provisions of the federal False Claims

Act, 31 U.S.C. § 3729, *et seq*. ("FCA") and the New York State False Claims Act,

N.Y. State Finance Law §§ 187 *et seq.* ("NYFCA") (collectively the FCA and

NYFCA are referred to as the "Acts"), to recover treble damages and civil

penalties on behalf of the United States of America ("United States"), the State of

New York ("New York State") and the City of New York ("New York City"),

arising from false claims that defendants Steven Dwek, New Windsor Community

Fitness Center, Corp., Healthy Kids Extended Day Program, Inc. and Harriman

Summer Camp, S-11, Inc. (collectively, "Defendants"), knowingly submitted or caused to be submitted to the 21st Century Community Learning Centers ("21st CCLC"), Child and Adult Care Food Program ("CACFP") and the Schools Out NYC ("SONYC") grant programs, and for reinstatement, twice lost compensation, interest, and actual, consequential, incidental and special damages on behalf of relator Luongo because of Defendants' wrongful employment retaliation against her for engaging in lawful and protected whistleblowing activities under the Acts, as well as, for attorneys' fees and litigation expenses and all other relief to which Relator is entitled under the Acts.

2.      As a result of the foregoing, the United States, New York State, New York City and Relator have suffered economic losses and other damages, the precise amount of which will be determined at trial.

## PARTIES AND ENTITIES

3.      The United States, New York State and New York City are the real party-plaintiffs in interest in the *qui tam* allegations in this action.  Relator is the real party-plaintiff in interest in the anti-retaliation allegations.

4.      The United States Department of Education ("USDE"), through the, Office of Academic Improvement (OAI)/Academic Improvement and Teacher Quality Programs ("AITQ") funds and oversees the 21st CCLC.  OAI is located at 400 Maryland Avenue, SW Washington, DC 20202.

5.      State and local governments and organizations administer the 21st CCLC.   In New York State, the 21st CCLC Program is administered by a collaborative effort among five primary entities: The New York State Education Department ("NYSED"), through its Office of Prekindergarten Through Grade 12 Education ("Office of P-12 Education"), The New York City Technical Assistance Resource Center (part of the New York City Department of Education), The Rest of State Technical Assistance Resource Center (part of Ulster BOCES), the State Evaluator (Measurement Incorporated) and 21st CCLC funded Grantees throughout the state.   The NYSED/ Office of P-12 Education is located 89 Washington Avenue, Albany, NY 12234.

6.      The United States Department of Agriculture ("USDA"), through the Food & Nutrition Service ("FNS"), funds and oversees the CACFP.   The FNS is located at 3101 Park Center Drive, Alexandria, VA 22302.

7.      The CACFP is administered by the States. In New York State, the New York Child and Adult Care Food Program ("NYS CACFP") is administered by the New York State Department of Health ("NYSDOH"), through the Bureau of Child & Adult Care Food Program (the "NYS CACFP Bureau").   The NYS CACFP Bureau is located at 150 Broadway, Rm. 650, Menands, NY 12204-2719.

8.      The City of New York, through its Department of Youth and Community Development ("DYCD") funds and administers the SONYC program

3

as part of its larger after-school program, knowns as the Comprehensive After School System of NYC ("COMPASS NYC," formerly known as, Out-of-School Time or "OST").  DYCD is located at 2 Lafayette Street, 19th Floor, New York, NY 10007.

9.      The City of New York obtains SONYC funding by redirecting New York State Foundation Aid received by New York City's Department of Education ("NYCDOE").

10.     Plaintiff/Relator Luongo resides in the County of Westchester, State of New York, and was employed by Defendants for approximately three years, beginning on or about October 24, 2011, and ending on or about October 21, 2014. Relator was nominally employed by the three corporate defendants in this action (collectively, the "Corporate Defendants,") being paid by and/or doing work, or identified as doing work, for all three Corporate Defendants at various times.  In addition, as a practical matter Dwek was Relator's *de facto* employer since he designated and cross-designated her employment between and among the three Corporate Defendants as he saw fit--often without Relator's knowledge.

11.     During her employment by Dwek and the Corporate Defendants, Luongo received paychecks and/or employment-related reimbursement checks from bank accounts in the names of Harriman, Union Ave. Community Fitness, New Windsor, and Healthy Kids Inc.  And, Luongo received IRS Forms W-2 from

various Corporate Defendants in different years.   For example, in 2014 she received W-2s from Defendant New Windsor Community Fitness Center and Defendant Healthy Kids Extended Day Inc.

12.    During her employment by Dwek and the Corporate Defendants, Luongo was identified as an employee of the respective organizations on letterheads, memoranda, emails or other corporate documents in the names of Defendant New Windsor Community Fitness Center, Defendant Healthy Kids Extended Day and Defendant Harriman.

13.    Defendant Steven Dwek ("Dwek") resides in the County of Rockland, State of New York, and is sole owner and actual or *de facto* chief executive officer, director and chairman of the board of the Corporate Defendants.   At all times relevant to this action, Dwek exercised complete and unfettered control over the Corporate Defendants and their employees and representatives, and he established all significant policies of the Corporate Defendants and oversaw and controlled all of their practices and activities, as well as their finances and personnel, both of which he commingled when it suited him.   As such, Dwek was, and is, the alter ego of each of the Corporate Defendants.   Dwek also created and used fictitious entities ("d/b/a's") in conjunction with the activities of the Corporate Defendants, including, but not limited to, Union Avenue Community Fitness Center, Union

Avenue Y Community Fitness Center, Healthy Kids Extended Day, NY Swim Academy and Splash N Dash Summer Day Camps.

14.     Defendant New Windsor Community Fitness Center, Corp., ("New Windsor Community Fitness Center") is an active New York domestic business corporation that was formed by Dwek on or about November 20, 2006 in the County of Orange.  At all times relevant to this action, among other things, New Windsor Community Fitness Center operated the Union Avenue Community Fitness Center ("Union Avenue Community Fitness Center"), located at 565 Union Avenue, New Windsor, NY 12553.

15.     Defendant Healthy Kids Extended Day Program, Inc. ("Healthy Kids Extended Day") is an active New York domestic business corporation that was formed by Dwek on or about August 13, 2013 in the County of Orange.  At all times relevant to this action, among other things, Healthy Kids Extended Day ran fee-based and non-fee based after-school programs at various locations in the State of New York.

16.     Defendant Harriman Summer Camp, S-11, Inc. ("Harriman") is an active New York domestic not-for-profit corporation that was formed by Dwek on or about November 20, 2006 in the County of Orange.  At all times relevant to this action, among other things, Harriman ran fee-based and non-fee-based summer camp programs at various locations in the State of New York.

17.     Each Corporate Defendant is the alter ego of the other two Corporate Defendants.  At all times relevant to this action, the executive and administrative offices for Defendants New Windsor Community Fitness Center, Healthy Kids Extended Day and Harriman, were, and continue to be, located in the same space at 565 Union Avenue, New Windsor, NY 12553 (Orange County).  At various times relevant to this action, the Corporate Defendants also maintained executive and administrative offices in the same space at 19 Squadron Blvd., New City, NY 10956 (Rockland County).  Further, at times relevant to this action, the Corporate Defendants shared the same telephone numbers, including, but not limited to, (845) 561-4700 and (845) 913-7050, and shared overlapping senior personnel, including, but not limited to Dwek, Luongo, Terri Dean, Lorie Coombs, Jeanne Martin and RaeAnne Nocera.  Luongo believes that during the relevant period of this action none of the Corporate Defendants had a board of directors, held board meetings, maintained board minutes or observed any corporate governance formalities.

18.     New Windsor Fitness Center Property, LLC ("New Windsor Fitness Center Property") is an active New York domestic limited liability company that was formed by Dwek on or about October 2, 2006 in the County of Orange.  At all times relevant to this action, among other things, New Windsor Fitness Center Property owned the Union Avenue Community Fitness Center, which Dwek had caused New Windsor Fitness Center Property to purchase from the New Windsor,

7

New York branch of a YWCA or YMCA, which entity had previously owned and operated the fitness center.

## JURISDICTION AND VENUE

19.    The court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 (federal question) and 1345 (United States as plaintiff), as well as, 31 U.S.C. § 3732(a) (False Claims Act).

20.    Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over state claims arising from the same transaction or occurrence as an action under the federal FCA) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

21.    The court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in this district.  Section 3732(a) further provides for service of process at any place within or outside the United States.

22.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants can be found, reside, and transact business in this district; an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

## FCA AND NYFCA SUBJECT MATTER JURISDICTION

23.     Upon information and belief, none of the subject matter or other jurisdictional bars set forth in the Acts is applicable to this action.

24.     Upon information and belief, prior to any "public disclosure" (as defined by the Acts), Relator voluntarily disclosed to the United States Attorney's Office for the Southern District of New York and the New York Attorney General's Office, the information on which the allegations or transactions in this complaint are based.

25.     Through her employment by Defendants and interactions with their employees, representatives and clients, Relator is an "original source" of the information on which her allegations are based, within the meaning of the Acts.

26.     Prior to filing this action, Relator voluntarily disclosed to the United States Attorney's Office for the Southern District of New York and the New York Attorney General's Office the information on which the allegations or transactions in this complaint are based.

## LIABILITY UNDER THE FCA AND NYFCA

27.     The FCA, 31 U.S.C. § 3729, provides that a person is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount

of damages which the Government sustains because of an act of that person, if, among other things, the person knowingly: (1) submits a false or fraudulent claim to the United States; or (2) makes a false statement or uses a false record material to a false or fraudulent claim to the United States. 31 U.S.C. § 3729(a)(1)(A) and (B). Damages are not an essential element of an FCA claim and liability can be premised on a penalties-only violation.

28.    Where the United States elects to intervene in the matter, the relator who initiated the *qui tam* action that obtains proceeds is entitled to receive between fifteen and twenty-five percent of any proceeds recovered in the action or settlement of the action. If the United States elects to not intervene in the matter the relator is entitled to receive between twenty-five and thirty percent of any proceeds recovered in the action or settlement of the action. 31 U.S.C. § 3730(d)(1) and (2).

29.    A relator who prevails in an FCA *qui tam* action is also entitled to receive from the defendant(s) an amount for reasonable expenses, attorneys' fees and costs. 31 U.S.C. § 3730(d)(1) and (2).

30.    The FCA also provides that any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of the FCA.  31 U.S.C. § 3730(h).

31.     Relief under 31 U.S.C. § 3730(h) includes reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.  31 U.S.C. § 3730(h).

32.     The NYFCA, effective as of August 27, 2010, imposes civil liability on "any person" who, among other things: (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; or (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  N.Y. State Fin. Law §§ 189(1)(a) and (b).

33.     Any person violating Section 189 is liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.  N.Y. State Fin. Law § 189.  Damages are not an essential element of a NYFCA claim and liability can be premised on a penalties-only violation.

34.    Where the attorney general or a local government elects to intervene or convert the action into an enforcement action, the relator who initiated the *qui tam* action that obtains proceeds is entitled to receive between fifteen and twenty-five percent of the proceeds recovered in the action or settlement of the action.  If the attorney general or local government elects to not intervene in the matter the relator is entitled to receive between twenty-five and thirty percent of the proceeds recovered in the action or settlement of the action.   N.Y. State Fin. Law §§ 190(6)(a) and (b).

35.    A relator who prevails in a NYFCA *qui tam* action is also entitled to receive from the defendant(s) an amount for reasonable expenses, attorneys' fees and costs. N.Y. State Fin. Law § 190(7).

36.    The NYFCA also provides that any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of the NYFCA.  N.Y. State Fin. Law § 191(1).

37.     A person who prevails under N.Y. State Fin. Law § 191(1) is entitled to all relief necessary to make the employee, contractor or agent whole. Such relief shall include but not be limited to: (a) an injunction to restrain continued discrimination; (b) hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position; (c) reinstatement of full fringe benefits and seniority rights; (d) payment of two times back pay, plus interest; and (e) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## RELEVANT DEFINITIONS UNDER THE FCA AND NYFCA

38.     For FCA and NYFCA purposes, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (iv) no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b); N.Y. State Fin. Law§ 188(3)(a).

39.     Under the FCA the term "claim" means, among other things, any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a

contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

40.     For purposes of the NYFCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property that (i) is presented to an officer, employee or agent of the state or a local government; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.   N.Y. State Fin. Law§ 188(l)(a).

41.     Under both Acts the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship,

from statute or regulation, or from the retention of any overpayment.  31 U.S.C. § 3729(b)(3); N.Y. State Fin. Law§ 188(4). And,

42.     For both Acts the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4); N.Y. State Fin. Law§ 188(5).

## LAWS AND REGULATIONS

### The 21st CCLC Program

43.     The 21st CCLC initiative is the only federal funding source dedicated exclusively to after-school programs.  The No Child Left Behind Act ("NCLB Act") reauthorized 21st CCLC in 2002, transferring the administration of the grants from the USDE to the state education agencies.  Each state receives funds based on its share of Title I funding for low-income students.

44.     The NCLB Act narrowed the focus of 21st CCLC from a community learning center model, where all members of the community benefited from access to school resources such as teachers, computer labs, gymnasiums and classrooms, to an after-school program model that provides services only to students attending high-poverty, low-performing schools.   The services they provide include academic enrichment activities that can help students meet state and local achievement standards.   They also provide additional services designed to reinforce and complement the regular academic program, such as: drug and

violence prevention programs, counseling programs, art, music, and recreation programs, technology education programs, and character education programs. Programs also may provide literacy and related educational development services to the families of children who are served in the program.

45.     Through the NCLB Act, Congress increased the funding for the 21st CCLC Program from $40 million to $1 billion.  With the NCLB Act, Congress also changed how 21st Century grants were distributed.  Rather than give money directly to schools, the program began distributing funds to states.  The amount of money allocated to each state is now based on the percentage of schools within a state that qualify as Title I schools (schools where at least 40 percent of the students are from families living below the poverty line).   The states then determine how the funds are distributed to schools.  See Elementary and Secondary Education Act of 1965, as amended, Title IV, Part B. § 4201 *et seq*. ("ESEA"). See also 34 C.F.R. §§ 74 to 99.

46.     Once the states receive 21st Century grant money from the USDE, they distribute it to eligible local entities that meet program requirements.  These entities can be any local organization that meets the ESEA eligibility requirements.

47.     States distribute 21st CCLC grant money to entities in three- to five-year grants.  This is done after (1) an entity has applied for a grant, (2) the state

finds that the entity is eligible to receive a grant, and (3) the state finds that the entity will use the money in accordance with ESEA standards.

48.     The ESEA requires 21st CCLC grant applicants to meet two major criteria: (1) entities must use the money only on services prescribed by the ESEA, and (2) these entities must periodically evaluate the progress of the grant-funded programs.  Both criteria are material to the decision of the USDE, and, in the case of New York State, the NYSED, in approving 21st CCLC grant applicants and providing monies to them.

49.     All 21st CCLC grantees are required to submit annual budgets, semi-annual attendance reports, quarterly expenditure reports, and other outcome-based data (for example, reading test scores) to the state departments of education of the states in which they operate.  These submissions are material to the initial grant decision and to the grantee's continued receipt of 21st CCLC Program monies.

50.     21st CCLC grant applicants in New York, including, Dwek, also had to comply with the NYSED's on-line Guide to Grants Administration and Implementation Resources, Version 2, dated July 13, 2010 (the "On-Line Guide"). According to the On-Line Guide, for-profit entities, such as Defendant New Windsor Fitness Community Center, are not allowed to receive reimbursement for indirect costs, but can only bill lawfully for service-related expenses.  Moreover, salary expenses that are directly related to service activities can only be billed for

17

the actual salary expense incurred (that is, passed through) and cannot be inflated to include a profit margin or for any other reason.  The On-Line Guide also expressly requires grant recipients to create and use purchase orders when buying materials for grant programs and further provide that all purchased materials can only be used for the specifically designated grant program and not for other activities.

## The NYS CACFP

51.   CACFP provides aid to child and adult care institutions and family or group day care homes for the provision of *nutritious foods* that contribute to the wellness, healthy growth, and development of young children, and the health and wellness of older adults and chronically impaired disabled persons.

52.   Under New York State's At-Risk Afterschool Snack and Supper Program (the "NYS At-Risk Afterschool Snack and Supper Program"), NYS CACFP aid is available to eligible after-school programs providing educational or enrichment programming for children up to 19 years of age.  The NYS At-Risk Afterschool Snack and Supper Program is intended to encourage children and teenagers to eat the nutritious snacks and suppers provided free of charge, and thereby discourage them from eating high salt, high sugar, and high fat foods, such as junk food and fast food.

53.     In order to obtain reimbursement under the NYS At-Risk Afterschool Snack and Supper Program an after-school program or center (known as a "sponsor"), must first apply for eligibility to the NYS CACFP Bureau.   If approved, the sponsor thereafter must submit a monthly reimbursement claim to NYS CACFP Bureau (either in hard copy or on-line) that records how many meals were served.  Per-meal funds are then reimbursed by the NYS CACFP Bureau to the sponsor directly.

54.     The NYS At-Risk Afterschool Snack and Supper Program reimburses eligible after-school programs at a fixed rate for each enrolled student in attendance.  The rate is adjusted annually in July.  In 2011 the reimbursement rate was approximately $0.75 per student, and currently it is $0.88.

55.     The USDA sets "meal pattern" requirements for recipients of CACFP funds that align with the Dietary Guidelines for Americans, as required by the Healthy, Hunger-Free Kids Act of 2010.  Among other things, there is a strict separate fruit component for snacks, a limit on fruit juice consumption and a requirement to provide potable drinking water throughout the day.

56.     Established in 1978, the serious deficiency process of the CACFP authorizes the USDA, through the FNS, as well as state agencies, including NYSDOH, to terminate or suspend institutions, facilities and centers (which include after-school programs) receiving CACFP from the program and to recover

monies paid to recipients for not adhering to USDA meal pattern requirements. See 7 CFR 226.

57.   Claiming reimbursement for a significant number of meals or snacks that do not meet CACFP requirements constitutes a serious deficiency under USDA regulations.  See 7 CFR 226.

58.   New York State child care license regulations have nutrition standards that are linked to CACFP requirements.   In order to receive NYS CACFP reimbursement under the NYS At-Risk Afterschool Snack and Supper Program, each snack and supper must meet USDA and NYS CACFP nutritional standards. Allowable food components include milk, fruits/vegetables, grains, and protein.

59.   The submission of claims for reimbursements for meals or snacks that do not meet USDA/CACFP and NYS CACFP nutritional requirements (such as so-called, "junk food," "fast food" or their equivalents) is material to the decision by the USDA/FNS, and the administering state agencies, including, NYSDOH/NYS CACFP Bureau, to their reimbursement decisions.

## The SONYC Program

60.   COMPASS NYC's middle school model, known as "SONYC," for School's Out NYC, serves as a pathway to success for youth in 6th, 7th and 8th grades.  Structured like clubs, the model offers young people a choice in how they spend their time; provides rigorous instruction in sports and arts; and requires

youth leadership through service.  The City itself becomes a classroom through trips and opportunities for instruction beyond a traditional learning setting. Programs are offered three hours each day, five days per week.

61.    DYCD establishes the requirements for receiving SONYC grants and administering and operating SONYC programs.  See, e.g., NYC, DYCD OST Middle School Expansion RFP Addendum 1, dated April 2, 2014; After-School Programs for Middle School Students; prepared by: The Office of the Mayor, DYCD; The City of New York, DYCD Contract.

62.    SONYC grantees are required to "partner" with New York City public schools.

63.    SONYC grantees must be certified IRS § 501(c)(3) non-profit organizations.  Thus, the status of an applicant as either a for profit or non-profit entity is material to DYCD's decision to award SONYC grants.

64.    In order to obtain SONYC grants prospective grantees must submit for DYCD's approval an Operating Budget, Workscope documentation and other materials.  DYCD requires that these items be submitted on-line, not in hard copy.

65.    Among other things, the proposed Operating Budget has to identify for each site an Agency Administrator, Program Director and Program Supervisor, as    well    as,    the    number    of    program    Aides.    See

https://www1.nyc.gov/assets/dycd/downloads/pdf/COMPASS_DYCD-

Online_Manual_FY16_Final.pdf.

66.     The Operating Budget also has to show "indirect costs" and fringe

benefit costs.  The Operating Budget also has to align with the Workscope.

67.     A grant applicant's truthful on-line identification of the specific

individuals who will serve as the Agency Administrator, Program Director and

Program Supervisor and all other staff, the amount of the compensation allocated

to those positions, the amounts listed for indirect costs and fringe benefits, and the

alignment of an Operating Budget with the Workscope, are material to DYCD's

decision to award SONYC grants.

68.     SONYC grantees must also make provisions for staff training and

orientation sessions in their operating budgets.  A grant applicant's representations

as to staff training and orientation sessions are material to DYCD's decision to

award SONYC grants.

## SPECIFIC FACTUAL ALLEGATIONS OF FALSE CLAIMS VIOLATIONS

## 21st CCLC False Claims

69.     In or about late 2012 or early 2013, Dwek applied for 21st CCLC

Program funds on behalf of Defendant New Windsor Community Fitness (at the

time d/b/a Healthy Kids Extended Day Program, which was an unincorporated

fictitious business).

70.     In or about July of 2013, Defendant New Windsor Community Fitness was awarded a sub-grant by New York State of 21st CCLC Program funds. The award was for three years and amounted to $359,300 annually. It covered three sites: one in Highland Falls, New York (Orange County) (the "Highland Falls Site") and two in Hyde Park, New York (Dutchess County).

71.     Under the terms of the grant, Defendant New Windsor Community Fitness was to provide literacy enrichment after-school classes for three hours per day/five days per week for (3) seven-week sessions. Luongo was on-site for a total of only 20 visits at a single site.

72.     Luongo supervised the Highland Falls Site for two seven-week sessions in 2014.

73.     Through her involvement with the Highland Falls Site, Luongo learned that Dwek caused Defendant New Windsor Community Fitness to submit false claims and create false records in connection with 21st CCLC Program funds.

74.     Among other things, Luongo observed that Dwek was misusing 21st CCLC Program funds:

a.      For learning and other materials used at for-fee programs Dwek was running with the Corporate Defendants, including, for example, sites in Yonkers, Brooklyn, Peekskill Arlington, Hyde Park, Chester, Newburgh, Valley Central and Washingtonville.

b.      For salaries of general administrative personnel, program managers and staff members at for-fee programs Dwek was running with the Corporate Defendants.  This included Luongo, Terri Dean and RaeAnne Nocera.

c.      For overhead expenses of the Corporate Defendants.

d.      For training staff who worked at for-fee programs Dwek was running with the Corporate Defendants, including, for example, sites in Orange and Westchester Counties.

75.      Luongo also learned that Dwek caused Defendant New Windsor Community Fitness to receive and retain 21st CCLC Program funds that were earmarked for a "literacy captain," staff training (e.g., Fountis and Pinnell Literacy Training ($9,750), Spark Training ($3,500) and Planning and Professional Development Anti-bulling Training ($2,000)) and class preparation (15 hours), but were never used for those purposes or were used far less than what was intended.

76.      In addition, Luongo found out that Dwek caused Defendant New Windsor Community Fitness to submit false and misleading outcome-based data to the NYSDE.  For example, he would use beginning of the school year (September) base-level reading test results to compare to end of school year (June) reading test results, rather than comparing start of session (February) reading test results with end of session (April) reading test results (7 weeks later).  This artificially inflated

outcome results by not eliminating intervening factors, such as student maturation and progress from the regular school curriculum.

77.    In summer of 2014, Literacy captain Rebecca Owens advised Dwek that it was improper for him to create and submit outcome-based data that relied on start of school year and end of school year test scores.  But the practice continued.

78.    Upon information and belief, Dwek refused to allow staff to do start of session/end of session comparison testing.

79.    The application form as well as the On-Line Guidance for the CCLC Program states that for-profit agencies are not entitled to administrative costs or indirect costs. Notwithstanding this prohibition, Dwek billed and received payment for these costs anyway. This included, for example, the salaries of Dwek (Executive Director), Lorie Coombs (HR Director), Jeanne Martin (Registration Specialist Director).  In the case of Dwek, he improperly billed $15,000 for himself as Executive Director for the period 7/1/2013 to 6/30/2014 and he improperly billed $16,666.67 for Luongo's time for the period 2/1/2014-6/30/2016.

80.    Contrary to On-Line Guide requirements, Dwek also inflated staff salaries by billing the CCLC Program for hours worked outside of the program. This included, for example, the salary expenses for Luongo and RaeAnne Nocera (both inflated by about $14,000 each) and Michelle Bollen (inflated by about $9,000).

81.    The On-Line Guide also required senior staff to submit "signed" quarterly reports of their hours and salary expenditures.  But, Dwek did not comply with this requirement either.  For example, Luongo never signed such a quarterly report.

82.    Dwek also did not abide by the On-Line Guide's requirement to use purchase orders to buy program materials and used purchase materials for activities other than the designated program.

83.    Dwek also inflated claims for Luongo's travel/mileage expenses, billing more than $1,000 for actual expenses that were less than one-third of the amount billed.

## CACFP False Claims

84.    At all times relevant to this action, one or more of the Corporate Defendants filed claims for reimbursement with the NYS CACFP Bureau under the NYS At-Risk Afterschool Snack and Supper Program for snacks that did not meet USDA/CACFP and NYS CACFP nutritional requirements.  This included providing junk-food type snacks and excessive amounts of fruit juice, while not providing potable water (for example, there were schools in Yonkers and Brooklyn that did not have operating water fountains).

85.    Dwek oversaw and directed which food items were purchased for the Corporate Defendants' afterschool programs.  He delegated the actual purchasing

of the food items, creation of menus and/or the submission of NYS CACFP reimbursement claims to various employees, including Luongo, Terri Dean and Jeanne Martin.  Luongo, for example, was required to purchase and deliver snacks to Defendant Healthy Kids Extended Day's after-school programs in Westchester and New York City.

86.     Beginning in or about August 2013, the functions of purchasing and delivering food items, and submitting NYS CACFP claims were centralized at the Corporate Defendants' New City offices.

87.     At that time, Dwek asked employee Jamie Moreno to prepare and submit the NYC CACFP reimbursement claim forms.  Moreno refused because the food items that were being distributed to the after-school program participants did not align with the menus that had been designed and did not comply with CACFP and NYS CACFP nutritional requirements.  Dwek then said he would have Jeanne Martin, who worked exclusively for Defendant New Windsor Community Fitness at the Union Avenue location, be responsible for filing the NYS CACFP reimbursement claim forms.  Luongo was present during this exchange.

88.     Luongo had voiced concerns over Dwek's and the Corporate Defendant's failure to provide nutritional snacks to other employees, including, Senior Director Terri Dean, Jamie Moreno and Adele Dowling.

## SONYC False Claims

89.    In or about May 2014, in violation of the SONYC Grant Program rule that grantees must be non-profit entities Dwek caused the for-profit corporation Defendant New Windsor Community Fitness Center to apply for a $305,000 SONYC grant for an after-school program at New York City public middle school MS 183, located at 2-45 Beach 79th Street, in Rockaway, New York 11693, which award was granted on June 18, 2014 (the "MS 183 SONYC Grant").  The MS 183 SONYC Grant was to cover an after-school program for 90 students.   Dwek applied under Defendant New Windsor Community Fitness using a Vendor Information Exchange System Number ("VENDEX Number") for that entity. NYC schools require the entities they contract with to have VENDEX Numbers and only non-profit entities are able to obtain them.   Since Defendant New Windsor Community Fitness Center has always been a for-profit corporation, Dwek must have obtained its VENDEX Number under false pretenses.   Dwek caused Defendant New Windsor Community Fitness Center to apply for SONYC grants at two other locations in or about May 2014, also in violation of the prohibition against for-profit applicants.

90.    Between on or about June 18, 2014 and July 31, 2014, DYCD notified Defendant New Windsor Community Fitness Center that it was withdrawing approval for the MS 183 SONYC Grant.  Upon information and belief, this was

because DYCD discovered the for-profit status of Defendant New Windsor Community Fitness Center.   Thereafter, Dwek switched the MS 183 SONYC Grant application from Defendant New Windsor Community Fitness Center to Defendant Harriman which was a non-operating non-profit entity that had no revenues, assets or employees and was not then engaging in any business activities.

91.   Defendants New Windsor Community Fitness Center and Harriman submitted false information to DYCD in order to obtain the MS 183 SONYC Grant.   This included false entries in the Workscope concerning narratives under "organization," "organizational structure," and "continuous quality improvement," where Dwek stated that Harriman was large, experienced in this area and active, when, in fact it, was not.   The submission of this false information fraudulently induced DYCD to transfer the grant initially awarded to New Windsor Community Fitness Center and to Harriman.

92.   Dwek was exclusively responsible for the submission of false information to DYCD in connection with the MS 183 SONYC Grant.

93.   Dwek knew or should have known that Defendant New Windsor Community Fitness was not eligible for the MS 183 SONYC Grant because it was a for-profit corporation.

94.    Upon information and belief, DYCD discovered Defendant New Windsor Community Fitness' for-profit corporate status and that is the reason it notified Dwek that he would lose the MS 183 SONYC Grant.

95.    In order to keep the MS 183 SONYC Grant, Dwek caused Defendant Harriman to step in as the community-based organization ("CBO") grant applicant. At the time, Harriman was merely a shell non-profit organization, with no board, officers or employees.  Dwek caused his employees, including Luongo, to create corporate governance documents that were submitted to Mayor's Office of Contract Services ("MOCS") in order to get Harriman a required VENDEX Number.  These documents, including one where Dwek made Luongo sign as a corporate officer, made it appear that Harriman was an active, functioning entity, when, in fact, it was not.

96.    Dwek also prepared and submitted false Operating Budget information to DYCD in order to persuade it to award the MS 183 SONYC Grant to Harriman.  Among other things, Dwek falsely listed in the budget submissions positions for full-time Program Director, Budget Manager and Program Supervisor (with annual salaries of $34,320, $40,000 and $55,000, respectively).  The Budget Manager . and Program Supervisor positions were listed at a per-cent rate (16.25% for the Budget Manager and 50% for the Program Supervisor assigned to the grant). Moreover, there was never a real Budget Manager for this program.

97.     Dwek also included other fictitious financial information in the Operating Budget, including, but not limited to, fringe benefits ($47,121).

98.     Additionally, Dwek listed three program aides in the Operating Budget at a combined rate of $14,520.  They were identified in the Workscope as a data entry specialist, a registration specialist and HR specialist.  In fact, no one in these roles worked for the grant program.  Each one of these was an administrative position, the cost of which should have been subsumed within the amount shown for Other Operational expense ($47,422, broken down as $17,442 for human resources and comprehensive training and $30,000 for other costs), not as additional costs.  This allowed Dwek to double dip for these costs and was contrary to instructions on the SONYC Grant application form which expressly states that "central administration" staff costs are not to be included the Budget.

99.     Dwek also prepared and submitted false Workscope materials to DYCD in order to persuade it to award the MS 183 SONYC Grant to Harriman.  Among other things, he provided for staff training and orientation sessions that he knew were fictitious.

100.   Dwek submitted the false Budget and Workscope information to DYCD in his purported roles as "Executive Director" and "Fiscal Officer" of Harriman.

101.   On or about October 3, 2016, Dwek and Luongo met with representatives of DYCD at their offices in New York City concerning the administration of the MS 183 SONYC Grant.  During the meeting Dwek repeated orally to DYCD officials the false representations he had conveyed to them in Harriman's proposed Operating Budget with respect to how he would be staffing and administering the MS 183 SONYC Grant.

102.   NYC regulations concerning the SONYC Grant Program require grant applicants to identify a CEO, CFO, COO and Senior Contract Manager in order to qualify for grant funding. At the time he applied for the SONYC Grant for MS-183, Dwek did not have actual employees for those positions. In order to meet the Protocol's requirements, Dwek falsely identified employees from his other organizations as the CEO, CFO, COO and Senior Contract Manager for Defendant Harriman, including, listing Jeanne Martin as the Senior Contract Manager and/or Executive Director, when, in fact, she was not. This violated clearly stated instructions on the SONYC Grant application precluding a grantee's employees from serving also as officers or directors of the contractor.

103.   Similarly, the SONYC Grant Workscope contains job descriptions to support the items in the budget. It clearly requires that the grantee have program aides on site to assist the Program Director with clerical duties. At the time he completed and submitted the Workscope for MS-183, Dwek did not have any

actual aides to fill the required positions. In order to appear to meet the SONYC Program's application and reporting requirements, Dwek listed three persons as aides in the Budget who in fact were full-time employees at his other entities in New Windsor or New City.  Their staff hours and compensation were also budget and reimbursed as administrative costs (i.e., indirect costs).  By budgeting these persons as on-site aides and administrative personnel Dwek also improperly received duplicative reimbursement for their costs.

104.   The SONYC Grant Workscope requires the grantee to participate in certain types of organizational training and the Budget permits reimbursement for its costs. Dwek also listed the cost of training as a budget item (subsumed within $17,442 under "Other Operational Costs") and received payment for it, but never actually had his employees and staff participate in any training programs.

## FACTS COMMON TO ALL GRANTS

105.   Dwek had exclusive control over the grant application process, financial management and reporting for all grants that the Corporate Defendants applied for or received.

## DEFENDANTS' UNLAWFUL RETALIATION AGAINST LUONGO

106.   On or about September 19, 2011, Dwek offered Luongo a job as a site director for a fee-based after-school program in Yonkers, New York, one that was being run by Defendant New Windsor Fitness Center, which at the time was

operating under the fictitious name of Healthy Kids Extended Day.   The employment offer, however, came on the letterhead of Union Avenue Community Fitness Center and was signed by Dwek.   This was the first of many instances where Dwek shuttled Luongo among the various corporate entities that he controlled.

107.   On or about October 24, 2011, Luongo began working as the Site Director at a single Yonkers school location and was paid at a rate of $542 weekly (or about $28,000, annually).

108.   Thereafter, between the end of 2011 and the middle of 2013, Luongo received a number of promotions and pay increases from Dwek (who was usually acting in the name of Defendant Healthy Kids Extended Day, and her responsibilities expanded from Site Director at one location in Yonkers to Westchester Area Coordinator/Supervisor for six sites in Yonkers, three sites in Peekskill and three sites in Brooklyn (at $596 weekly, or about $31,000 annually), and then later to Westchester/New York City Regional Director for fee-based after-school programs being run by Defendant New Windsor Fitness Center and Defendant Healthy Kids Extended Day, with a salary increase to $40,000, annually.   Among other things she did during this time, Luongo arranged and purchased food items, which she later learned were part of the CACFP.

109.   In or about August 2013 Dwek, Luongo and Penny Sunshine, the newly-hired Regional Director of Orange/Dutchess Counties of Defendant Healthy Kids Extended Day moved into new corporate offices at 19 Squadron Blvd., New City, NY 10596.  Dwek fired Ms. Sunshine a month later and he assigned many of Ms. Sunshine's responsibilities to Ms. Luongo in addition to her own.

110.   In or about February 2014, Dwek assigned Luongo to be the Program Supervisor for a 21st CCLC grant-based after-school program being run by Defendant Healthy Kids Extended Day at a site in Orange County, New York.

111.   Beginning in or about March 2014, Dwek tasked Luongo with assisting in obtaining DYCD SONYC grants on behalf of Defendants New Windsor Community Fitness Center and/or Defendant Healthy Kids Extended Day.

112.   In or about April 2014, in recognition of her new responsibilities as a 21st CCLC Program Supervisor Dwek gave Luongo another pay raise, increasing her annual salary to $44,000.  In February 2014, Dwek had offered and promised Ms. Luongo a raise to of 20%, but only increased her salary by 10% in April of that year.

113.   In or about June 2014, Dwek, initially on behalf of Defendant New Windsor Community Fitness Center and/or Defendant Healthy Kids Extended Day assigned Luongo to be the Program Supervisor for the MS 183 SONYC Grant, in

addition to her other responsibilities, with a proposed pay raise to $55,000, annually.

114.   On or about July 31, 2014, Dwek shifted the MS 183 SONYC Grant from Defendant New Windsor Community Fitness Center to Defendant Harriman.

115.   From in or about June 2014 until on or about September 1, 2014, Luongo performed various tasks on behalf of Defendants Dwek, New Windsor Community Fitness Center, Healthy Kids Extended Day and Harriman in connection with the administration of the MS 183 SONYC Grant, including, identifying community partners, obtaining licensure for operating a School Aged Child Care ("SACC") program and hiring on-site staff, including, a Director and an Academic Specialist.

116.   In or about August 2014, Dwek proposed making Luongo an "officer" of Harriman because, as he explained to Luongo, the MS 183 SONYC Grant had been transferred to Harriman.   Luongo refused, saying, in sum and substance, that being an officer carried certain legal and fiduciary duties and obligations and she was not comfortable assuming those with respect to Harriman.   This was because she knew Harriman was a shell corporation and knew that Dwek had gotten the grant improperly under New Windsor Community Fitness Center and then transferred it to Harriman.   Luongo had also learned right at that time that Dwek had listed Lorie Coombs, the HR director for a number of Dwek's other corporate

36

entities, as an officer of Harriman since 2008 without Ms. Coombs' knowledge or authorization.

117.   On or about September 2, 2014, Dwek presented Luongo with a copy of a newly-acquired D&O policy for Harriman, saying she would be protected if she were to change her mind about refusing to become an officer of Harriman. This clearly reflected Dwek's awareness that Luongo was highly concerned about the propriety in which he was operating the Harriman entities and his reference to the D&O policy was his attempt to assuage her concerns about corporate improprieties.  Dwek further tried to compel Luongo to become a Harriman officer by Dwek telling her that the SONYC Grant would not go forward without her doing so.  At that point, Luongo relented, but in an obviously reluctant manner. Dwek also sent Luongo an email (the "September 2 Email") advising her he raised her annual salary to $52,000, with a promise to increase it to $55,000, effective January 1, 2015.  Dwek had previously promised here the raise to $55,000 in June 2014 but delayed actually fulfilling his promise for about six months.   In the September 2 Email, Dwek repeatedly praised and lauded Luongo for her extraordinary leadership skills and contributions to his organizations.  Specifically, Dwek wrote:

> I'm pleased to follow up on our discussion and increase your salary to $52,000 annually effective Sept 1 to reflect you taking on the huge (and hugely complicated!) SONYC program in Far Rockaway as part of your Regional Director position. You have presided over incredible growth in your area since

you took on a leadership role and I'm glad that your salary is moving up correspondingly. *I want to specifically mention the outstanding job you did in getting the SONYC program for Healthy Kids- a truly impressive feat.* I know you will work on developing our organizational goal for this year- positive leadership skills- and your salary will increase to $55,000 annually effective January 1. *Thank you for bringing your incredible skill set to Healthy Kids and helping the organization grow to the next level.*

(Emphasis added.)

118.  Dwek established a compensation arrangement, without Luongo's knowledge, whereby part of Luongo's salary was paid by Defendant Harriman ($27,500, from the MS 183 SONYC Grant budget) and Defendant Healthy Kids Extended Day ($27,500, from a mix of 21st CCLC grants monies and for-profit fees).  This was a fact Luongo learned only after she got a copy of the grant budget on or about September 30, 20145.

119.  On or about September 11, 2014, Dwek made Luongo the Administrator of the MS 183 SONYC Grant in addition to her prior assignment as the Program Supervisor.  For approximately one week thereafter Luongo submitted or attempted to submit grant-required information to DYCD via its on-line registration/enrollment software.   During the next few weeks Luongo received training from DYCD about administering the grant and using its on-line software.

120.  On or about September 25, 2014, while at DYCD's offices Luongo learned from Shaheeda Smith, one of DYCD's staff members, that DYCD was concerned about deficiencies in Dwek's/Harriman's management of the MS 183 SONYC Grant, including the lack of a proper input of both the Workscope and

Budget.  At Luongo's request, the DYCD staff person provided her with the Workscope that Dwek had submitted to DYCD.  Prior to that Luongo had never received from Dwek or seen copies of the Workscope, Budget or School Partnership Agreement, which parenthetically, made it virtually impossible for her to properly supervise and administer the SONYC Grant.  Upon information and belief, Dwek had deliberately withheld these materials from Luongo so that she would not see the false information they contained.

121.  On or about September 30, 2014, Dwek emailed Luongo with budget documents he had prepared and submitted for the MS 183 SONYC Grant.  Luongo saw that Dwek had falsified a number of items concerning staffing and administration.  From the time Luongo received the Workscope from Ms. Smith on or about September 25 until Dwek gave Luongo the budget materials on or about September 30, 2014, her emails with Dwek reflected an increasing tension between them, as her concerns about his grant improprieties continued to escalate.

122.  On or about October 1, 2014, Ebony Jordan-Wilson, a representative from DYCD requested a face to face meeting with Dwek and Luongo at DYCDs offices.  The request was made via email and set the meeting for October 3 at DYCD's offices.

123.  Prior the October 3 meeting, Luongo sent Dwek an email on October 2, 2014 (the "October 2 Email") stating that she "will not be attending" the October

39

3 meeting with Dwek and DYCD officials that they had requested to discuss deficiencies in the MS 183 SONYC Grant administration materials that had been submitted on behalf of Defendant Harriman and requesting that he remove her as the Program Administrator of the MS 183 SONYC Grant and offering to resign from any role in that program.  Luongo sent this email because she did not want to be complicit with, and perpetuate, Dwek's fraud against DYCD.  This was a highly unusual step for Luongo, or any employee of Dwek's for that matter, to take.

124.   After Luongo sent Dwek the October 2, at his instigation Dwek met with Luongo at her office in New City, NY, and asked her, in sum and substance, "Why did you send me that email?"   Luongo replied, in sum and substance, "Having seen your misrepresentations in the Budget and Workscope I would not be able to answer DYCD's prospective questions honestly.  The materials you submitted show things that are not correct, including: a line item for training that, in fact, you would not allow; overstating the respective roles and compensation for staff (including, the Program Director's hours and my salary as Program Supervisor); and listing positions for three aides, when no such aides existed."

125.   At that time Luongo also objected to Dwek about his misuse of 21st CCLC funds.  Specifically, in sum and in substance, Dwek and Luongo engaged in the following exchange: Dwek: "Are you suggesting I did these things intentionally?  Luongo: "I don't want to be in a position to make that suggestion."

Dwek: "Well, why did you say that then."  Luongo: "We both know you are misusing 21th Century funds to purchase materials for all other Healthy Kids sites."  Dwek: "Why would you say that?" Luongo: "Because you told Penny and me that when we opened the New City office."  Dwek: "I'm sorry you feel that way.  It is important for you to come to the meeting tomorrow.  I don't expect you to have to say anything."  Luongo: "Fine. I will go to the meeting but I won't lie." Dwek then promptly left Luongo's office and the building.  Luongo then walked out of her office and met with fellow employee Jamie Moreno and predicted that Dwek was going to fire her because "I had just told him [Dwek] that he is committing fraud."

126.  On or about October 3, 2016, Dwek and Luongo met with representatives of DYCD at their offices in New York City concerning the administration of the MS-183 SONYC Grant.  During the meeting Dwek made false representations to DYCD officials about how he was staffing and administering the grant.  For example, Ms. Jordan-Wilson asked, "Where are your aides?"  And Dwek falsely replied, "They are off-site," when, in fact, the employees he was alluding to were not performing any work for the MS-183 Grant Program and was double billing for people whose salaries were also being reimbursed as indirect overhead costs.  After the meeting, which ended around 12:00 p.m., while Luongo was driving to MS-183 and Dwek was driving to his

41

offices, they spoke by cell phone and in sum and substance engaged in the following exchange: Luongo:  "The issue about the fictitious aides is why I did not want to go to the meeting."  Dwek: "Let's not discuss this now. I'm going to work on fixing these things."

127.   Three days later, on or about October 6, 2016, Dwek sent Luongo a text message telling Luongo he was removing her as Regional Director for Defendant Healthy Kids Extended Day for the Westchester region and replacing her with Natalie Gerving, a resident of Orange County.  At that time Gerving was the Site Supervisor of a 21st CCLC grant program in Orange County, and had no experience with, or knowledge of, any of the programs in Westchester County.

128.   Taking away Luongo's responsibilities as Regional Director for the Westchester Region, and replacing her with someone who was not up to the task, was in retaliation for Luongo having objected to Dwek's improper conduct in connection with the MS 183 SONYC Grant and 21st CCLC grants.

129.   Shortly after taking away Luongo's responsibilities as Regional Director, Dwek left on October 8, 2014 for a previously scheduled two-week vacation.  Immediately upon his return on or about October 21, 2014, Dwek asked Luongo to meet with him at his office in New City and, without any previous warning and without anyone else being present, verbally fired Luongo.

130.   At the time of Luongo's termination, Dwek said he was letting her go because he had received an email from "someone" at MS 183 criticizing Luongo's work.  Dwek did not give Luongo the opportunity respond to any of the supposed criticisms of her work.  Luongo requested to see the email and to have the Board of Directors of Harriman review the matter.   Dwek refused both requests and promptly left the offices.  Luongo then contacted Ms. Coombs and requested a copy of the email that Dwek referred to.   Ms. Coombs deferred the matter to Dwek.  Upon information and belief, since it has not been produced in discovery, there was no such email.

131.   Dwek's stated reason for firing Luongo was a complete fabrication and pretext.   During the entire time of her employment, Dwek repeatedly complimented Luongo and here work performance. Among other things he said, in sum and substance, "he had seen her work magic" and that "her communication and organizational skills were superior and made here stand out among all the other employees in Westchester and New York City."   Commiserate with his favorable comments to her Dwek raised Luongo's salary five times in three years.  Also, Dwek fired Luongo without warning and without giving her the opportunity to correct any supposed deficiencies concerning her administration and supervision of the MS-183 Grant Program.  Moreover, the deficiencies at that program were due to understaffing, lack of training, insufficient preparation time and inadequate

43

hiring procedures, all of which were attributable solely to Dwek's management and not Luongo's performance.

132.   The true and sole reason that Dwek fired Luongo was because she had objected to the fraudulent manner in which Dwek and the Corporate Defendants had obtained and used 21st CCLC and SONYC grant funds.

133.   Luongo has suffered lost earnings and other tangible and intangible damages as a result of her wrongful termination.

## COUNT I
### (FCA False Claims Violations, 31 U.S.C. § 3129(a)(1)(A) and (B)) Against All Defendants

134.   Relator realleges and incorporates all allegations in this second amended complaint as though fully set forth herein.

135.   In connection with the application for and use of 21st CCLC grant funds, Defendants knowingly submitted or caused the submission of a false claim to the United States and made, used, and caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.

136.   In connection with the application for and use of CACFP funds, Defendants knowingly submitted or caused the submission of a false claim to the United States and made, used, and caused to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the Government.

137.   By engaging in the above-described fraudulent conduct, Defendants violated 31 U.S.C. § 3129(a)(1)(A) and (B) and caused the United States to suffer economic damages.

## COUNT II
### (NYFCA False Claims Violations, N.Y. State Fin. Law §§ 189(1)(a) and (b)) Against All Defendants

138.   Relator realleges and incorporates all allegations in this second amended complaint as though fully set forth herein.

139.   In connection with the application for and use of SONYC grant funds, Defendants knowingly presented, or caused to be presented a false or fraudulent claim for payment or approval and knowingly made, used, and caused to be made or used, a false record or statement material to a false or fraudulent claim.

140.   By engaging in the above-described fraudulent conduct, Defendants violated N.Y. State Fin. Law §§ 189(1)(a) and (b) and caused New York State and New York City to suffer economic damages.

## COUNT III
### (FCA Anti-Retaliation Violation, 31 U.S.C. § 3730(h)) Against All Defendants

141.   Relator realleges and incorporates all allegations in this second amended complaint as though fully set forth herein.

142.   Luongo engaged in protected activity under the FCA by objecting to Defendants' fraudulent application for, and use of, 21st CCL grant funds.

143.   Defendants were aware that Luongo was engaging in protected activities because she communicated her objections to Dwek directly.

144.   Dwek, acting on behalf of himself and the Corporate Defendants, withdrew Luongo's responsibilities as Regional Director for the Westchester region in retaliation for her having engaged in protected activity under the FCA.

145.   Dwek, acting on behalf of himself and the Corporate Defendants, terminated Luongo's employment entirely for her having engaged in protected activity under the FCA.

146.   Luongo suffered, and has continued to suffer, damages as a result of Defendants' violation of her rights under 31 U.S.C. § 3730(h).

**COUNT IV**
**(NYFCA Anti-Retaliation Violation, N.Y. State Fin. Law § 191(1))**
**Against All Defendants**

147.   Relator realleges and incorporates all allegations in this second amended complaint as though fully set forth herein.

148.   Luongo engaged in protected activity under the NYFCA by objecting to Defendants' fraudulent application for, and use of, SONYC grant funds.

149.  Defendants were aware that Luongo was engaging in protected activities because she communicated her objections to Dwek directly.

150.  Dwek, acting on behalf of himself and the Corporate Defendants, withdrew Luongo's responsibilities as Regional Director for the Westchester region in retaliation for her having engaged in protected activity under the NYFCA.

151.  Dwek, acting on behalf of himself and the Corporate Defendants, terminated Luongo's employment entirely for her having engaged in protected activity under the NYFCA.

152.  Luongo suffered, and has continued to suffer, damages as a result of Defendants' violation of her rights under N.Y. State Fin. Law § 191(1).

## PRAYER FOR RELIEF

WHEREFORE, Relator, acting on behalf of, and in the name of, the United States, New York State and New York City, pursuant to 31 U.S.C. § 3730(b) and N.Y. State Fin. Law§ 190(2), demands and prays that judgment be entered in favor of the United States, New York State, New York City and herself against Defendants as follows:

1.      Under Court I, in favor of the United States for treble the amount of the United States' damages, plus the maximum statutory penalties for each false claim or false statement;

2.      Under Court II, in favor of New York State and New York City for treble the amount of their damages, plus the maximum statutory penalties for each false claim or false statement;

3.      Under Court III, in favor of Relator for all relief to which Relator is entitled under 31 U.S.C. § 3730(h), including, but not limited to, reinstatement with the same seniority status that Relator would have had but for Defendants' unlawful discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

4.      Under Court IV, in favor of Relator for all relief to which Relator is entitled under N.Y. State Fin. Law§ 190(2), including, but not limited to, (a) an injunction to restrain continued discrimination; (b) hiring, contracting or reinstatement to the position Relator would have had but for Defendants' unlawful discrimination or to an equivalent position; (c) reinstatement of full fringe benefits and seniority rights; (d) payment of two times back pay, plus interest; and (e) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

5.      Relator, on her own behalf, further demands and prays that an award be made in her favor as follows: for 25 percent (25%) of the proceeds collected by the United States and/or New York State and New York City if they intervene in

and conduct this action, or for 30 percent (30%) of the proceeds if they do not intervene;

6.      Relator also demands and prays for an amount for reasonable expenses necessarily incurred by Relator in prosecution of this action; and for all reasonable attorneys' fees, expenses and costs incurred by Relator and her counsel;

7.      For all costs of this civil action;

8.      For prejudgment interest;  And,

9.      Such other and further relief to which Relator is entitled or is just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator demands that this case be tried before a jury.

Dated:  July 9, 2018
         New York, NY

MCINNIS LAW

/s/ Timothy J. McInnis

_____
Timothy J. McInnis, Esq. [7151]
521 5th Avenue, 17th Floor
New York, NY 10175-0038
Tel. (212) 292-4573
Fax (212) 292-4574
tmcinnis@mcinnis-law.com

*Attorneys for Relator*